## REYNOLDS & REYNOLDS CO. v. NORICK et al.
### No. 2035.

Circuit Court of Appeals, Tenth Circuit.
July 31, 1940.

Rowan A. Greer, of Dayton, Ohio (Keaton, Wells & Johnston, of Oklahoma City, Okl., Toulmin & Toulmin, of Dayton, Ohio, David I. Johnston, of Oklahoma City, Okl., and H. A. Toulmin and H. A. Toulmin, Jr., both of Dayton, Ohio, on the brief), for appellant.

Kenneth E. McAfee and J. B. Dudley, both of Oklahoma City, Okl. (Brown & McAfee and Dudley, Hyde, Duvall & Dudley, all of Oklahoma City, Okl., on the brief), for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

This action was instituted by Reynolds & Reynolds Company, of Dayton, Ohio, against Henry Norick and Walter Norick of Oklahoma City, Oklahoma, copartners engaged in business under the trade name Norick Bros., Printers. The parties will be referred to as they appeared in the trial court. Both are engaged in the printing business and are competitors, particularly in the printing and furnishing of forms for use by automobile dealers and agencies. Plaintiff alleged that in the year 1929 it originally conceived and placed on the market a set of complete forms covering business systems, including accounting, sales, service and miscellaneous forms, shop and repair orders, binders and other forms, adaptable to automobile dealers and agencies; that such forms were prepared and arranged under various, proper and appropriate headings, all in a distinctive style, form, color, design and arrangement of matter thereon; that they have become generally known throughout the trade and to the public as Dealers' Standard Accounting Forms, generally referred to as DSA forms; that DSA is the duly registered trade-mark of plaintiff, issued October 4, 1932; that with intent to cheat and defraud plaintiff of its just rewards and profits, and in misappropriation of its property rights and interests, defendants copied, simulated, imitated, counterfeited, pirated and plagarized a number of such forms, and sold them to the same trade as that dealt with by plaintiff; that in further effort to appropriate the business of plaintiff, defendants placed

or printed upon their forms the repeat order numbers of plaintiff for their genuine forms, with the digit "1" added in front of the regular repeat order of plaintiff; that the forms of defendants are inferior in quality, grade and skill in workmanship to those of plaintiff, but that the two cannot be distinguished by casual examination; that through their wrongful conduct, defendants caused the trade generally to believe that they handle, make and sell the genuine forms of the manufacture of plaintiff; and that plaintiff has lost and, unless defendants are restrained from continuing such unfair trade practice, will continue to lose profits and sustain injury to its reputation, standing and good will in the trade. The prayer was that defendants be enjoined from further copying and simulating such forms and selling them to the trade, and for an accounting.

Defendants answered that they have served automobile dealers since 1910; that in 1918, they adopted and began printing the various forms comprising a complete accounting system called Standard Accounting System for use by those engaged in the business of automobile dealers and agencies; that most, if not all, of such forms were different from those previously seen by defendants, but the methods and practices for accounting in such business were more or less uniform; that such original system was improved and revised on different occasions; that the forms constituting the system of plaintiff are remarkably similar to those previously printed and sold by defendants; that in theory, practice and effect the two are the same, and by slightly changing the names of the various accounts and numbers thereof, those printed by defendants could be substituted and used in the place of those printed by plaintiff; that the forms of plaintiff were not in any sense new, novel or original; that in preparing its forms, plaintiff copied and simulated forms theretofore made and printed by defendants; that the forms of plaintiff were designed particularly for use by the various dealer organizations of General Motors Corporation and its subsidiaries; that General Motors and its subsidiaries designed them, and ever since have waged an active campaign to induce all of their dealers to adopt and use them; that a provision contained in the licenses or franchises of the dealers required them to use and keep a uniform accounting system in strict accord with the accounting manual furnished by General Motors and its subsidiaries; that such dealers have thus been induced and required to install the Dealers' Standard Accounting System and keep it in accordance with such manual; that the necessity of following the instructions contained in the manual rendered it imperative that anyone desiring to sell any of the various accounting forms to such dealers make his forms of the size and arrangements of those set out in the manual; that in an effort to procure a monopoly upon the right to furnish all of such forms, plaintiff actively engaged in leading such dealers to believe that it was necessary for them to adopt and use such forms and that it had the exclusive right to make and furnish them; that the trade-mark DSA was imprinted on all of the forms furnished by plaintiff; that defendants so distinguished their various forms that it is extremely unlikely that any person has been or will be misled as to the source of manufacture; that defendants consistently maintained and carried on an extensive and expensive advertising campaign to promote their name and products; and that plaintiff simulated and copied certain of their forms and sold them to the same trade with which defendants dealt.

The court found that the accounting systems for automobile dealers had been gradually developed, based upon the actual experience of and suggestions from dealers and manufacturers; that the forms constituting such systems are directly the result of the development of the automobile business, and have been reduced to their present form by expert accountants and printers specialized in that type of work; that during 1929, plaintiff utilized the information derived from the representatives of the industry, and upon the advice and with the approval of General Motors Corporation composed the system of accounting and bookkeeping in question for use by its dealer agencies and subsidiaries; that such forms were prepared as to form, shape, design, arrangement of columns and printed matter, as specified by General Motors; that plaintiff also printed and distributed a publication called "Dealers' Standard Accounting System Manual"; that in various of such manuals and over the signature of the subsidiaries of General Motors, plaintiff represented to the buying public and particularly to the dealers in the products of General Motors and its subsidiaries, that such forms and system were designed by General Motors and its

subsidiaries; that plaintiff began to market such forms under its registered trade name DSA, and was the first in the field to market such forms as a complete system, under the approval of the manufacturer of automobiles; that since 1913, defendants have specialized in the making and selling of accounting forms for automobile dealers and have become known as a source of supply for such forms by most of the dealers in the United States; that General Motors urged and insisted that all of its dealers adopt and use accounting forms of uniform ruling, and with columns headed up in the particular manner and arrangement of the forms which constitute the DSA system; that during the year 1937, defendants began making and selling forms of the same identical columnar arrangement and of the same general form as the forms theretofore made by plaintiff; that they made them for General Motor dealers for the reason that the trade could not and would not use them of any other form and arrangement, and not because of any desire or intention on the part of defendants to mislead expected purchasers as to the source or origin of the products being sold; that on each of such forms defendants placed in the upper left-hand corner their tradename, address and reorder number in such position and with such prominence that any one looking at such forms would recognize and know that they were made by defendants and not by plaintiff; that in the conduct of their business, defendants advertised the products which were sold as products of their own manufacture, and did not at any time misrepresent the facts in connection with the manufacture and sale thereof; and that no one had been deceived by defendants in respect to the source or origin of any of the products which they sold, and nothing appeared to indicate the likelihood of deception in the future. Judgment was entered for defendants, and plaintiff appealed.

█ A trade-mark is a distinctive mark of authenticity through which the merchandise of a particular producer or manufacturer may be distinguished from that of others. Its sole and exclusive function is to designate, identify and point out distinctively the origin of the products to which it is attached. Elgin National Watch Co. v. Illinois Watch Co., 179 U.S. 665, 21 S.Ct. 270, 45 L.Ed. 365; Standard Paint Co. v. Trinidad Asphalt Co., 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed. 536. But the trade-mark of plaintiff may be laid aside without more as there is no claim that it has been infringed in any manner.

██ The grievance of plaintiff is that defendants simulated its forms, and in doing so engaged in unfair trade practice. Deceit is the basis of an action of this character. The principle underlying unfair trade practice cases is that one manufacturer or vendor is palming off his merchandise as that of another, Singer Manufacturing Co. v. June Manufacturing Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118; Elgin National Watch Co. v. Illinois Watch Co., supra; Standard Paint Co. v. Trinidad Asphalt Co., supra; Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73; or that he is vending the products of another as his own, International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293.

█ These forms are not protected by copyright or patent. In the absence of such protection, plaintiff has no exclusive right to their use. They belong to the public and are open to use by defendants or any one else, and the enjoyment of that right by defendants carries with it only the obligation to identify their products in such manner that they will not reasonably be taken for those of plaintiff. Kellogg Co. v. National Biscuit Co., supra. And it is not necessary that they so designate their merchandise that careless or indifferent buyers will not fail to know their source. Instead, they are required only to mark or designate them in such manner that purchasers exercising ordinary care to discover whose products they are buying will know the truth and not become confused or mistaken. Allen B. Wrisley Co. v. Iowa Soap Co., 8 Cir., 122 F. 796; Turner & Seymour Manufacturing Co. v. A. & J. Manufacturing Co., 2 Cir., 20 F.2d 298.

█ Both plaintiff and defendants in this case are widely known in their trade. Both market their forms by direct sales to dealers who use them. Some sales are made through orders solicited by salesmen and others through the mails. Neither has brokers, wholesale or retail agencies, or other like distribution facilities. The forms of plaintiff are of a distinctive design and appearance, and they bear its trade-mark. Those of defendants are printed on a different kind of paper; they do not bear the trade-mark; and the tradename, address and reorder number of defendants are

placed in their upper left-hand corner in such a position and with such prominence that any purchaser or other person looking at such forms would immediately know the truth—that they were manufactured by defendants, not plaintiff. They are of identical columnar arrangement and of the same general form as those of plaintiff. They bear the same reorder numbers as those of plaintiff with the digit "1" positioned in front of the repeat order numbers of plaintiff. But defendants began thus simulating the forms of plaintiff for the sole reason that through the concert of action between General Motors and its subsidiaries and plaintiff in respect to these uncopyrighted forms, dealers of General Motors and subsidiaries could not and would not use any other form or arrangement. The simulation was not due to any desire on the part of defendants to mislead expected purchasers in respect of the source or origin of their merchandise. It was not to palm off the merchandise of defendants as that of plaintiff, or to vend the products of plaintiff as those of defendants. In the conduct of their business which is very substantial in volume, defendants have consistently advertised the forms which they sold as forms of their own manufacture. They have never misrepresented the facts concerning the source or origin of their merchandise. They have not deceived any one. The record is barren of evidence of deceit in the past and there is no fact or circumstance which indicates the likelihood of deceit in the future. To grant plaintiff the relief which it seeks would be to proscribe legitimate competition, not to punish unfair competition. It would be nothing short of extending by judicial mandate the doctrine of unfair competition to the point of creating a copyright for the benefit of plaintiff. That we are not at liberty to do.

Plaintiff relies strongly upon International News Service v. Associated Press, supra. There complainant was engaged in the business of gathering at great expense news from all parts of the world and distributing it to its members for publication in their newspapers. Defendant similarly gathered news and sold it to customers and clients for like publication. Defendants pirated the news of complainant by copying it from bulletin boards and early editions of newspapers and selling it either bodily or in rewritten form to its own customers. The court held that complainant had a property right in the news thus gathered, as a business commodity; and that the practice of defendant in taking news from bulletins and early editions and selling and distributing it without any original investigation or expense constituted unfair business competition for which a court of equity would grant appropriate relief. It is manifest that the facts in that case were essentially and decisively different from those presented here. The determinative differences are plain and do not call for elaboration.

The judgment is affirmed.