Lorraine SINKLER, Plaintiff,

v.

Emma GOLDSMITH, Defendant.

No. CIV 83–1298 PHX CLH.

United States District Court,
D. Arizona.

Oct. 1, 1985.

Robert C. Hackett, David W. Dow, Mohr, Hackett, Pederson, Blakley, Randolph & Haga, P.C., Phoenix, Ariz., and Lloyd L. Zickert, Lee, Smith & Zickert, Chicago, Ill., for Emma Goldsmith and Thelma G. McDonald.

Adam Bourgeois, Chicago, Ill., and Peter S. Balkan, Phoenix, Ariz., for Lorraine Sinkler.

## MEMORANDUM OPINION AND ORDER

HARDY, District Judge.

The plaintiff Lorraine Sinkler (Sinkler) commenced this action against the defendant Emma Goldsmith (Emma) to obtain a declaratory judgment "declaring the rights, duties and legal relations of plaintiff and defendant with regard to the letters, memoranda and manuscripts of Joel S. Goldsmith (Joel) and that plaintiff be granted the right to publish the book *Horizons of Consciousness* and any and all letters of Joel S. Goldsmith that he sent to plaintiff." Emma counterclaimed for a declaratory judgment that Sinkler had no right to publish Joel's letters, for injunctive relief and damages for copyright and trademark infringement, for wrongfully using Joel's name, and for damages for breach of contract. Emma is mentally incompetent, and her daughter, Thelma G. McDonald (McDonald), has been named her guardian ad litem. Both parties have moved for summary judgment.

■ While she commenced this action, Sinkler now contends that the court should abstain from deciding the issues because the dispute between the parties is an ecclesiastical one. While the first amendment bars civil courts from adjudicating internal disputes of religious organizations, *see Serbian Eastern Orthodox Diocese, etc. v. Milivojevich,* 426 U.S. 696, 713, 724, 96 S.Ct. 2372, 2382, 2387, 49 L.Ed.2d 151 (1976), a civil court is the proper form for resolving property disputes between religious bodies, *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 445, 89 S.Ct. 601, 604, 21 L.Ed.2d 658 (1969). The issues in this case involve property rights—copyright and trademark infringement, the right to exploit another's name, and breach of contract. It would be improper for this court to abstain from resolving the issues.

## FACTUAL BACKGROUND

The Infinite Way was founded by Joel S. Goldsmith in 1947. It may be character-

ized as a non-traditional, non-structured spiritual movement. During his lifetime, Joel disseminated his teachings of The Infinite Way worldwide to thousands of students and other persons through lectures and classes, tape recordings of his lectures and classes, books, and The Infinite Way monthly Letters. The offices of The Infinite Way were established by Joel and Emma in Hawaii in about 1952 and were primarily supervised by Joel until his death in 1964. In 1969 the offices were moved to Santa Fe, New Mexico, and in 1975 they were moved to Youngtown, Arizona, where they are presently located.

In 1949 Sinkler met Joel and became one of his students. Over the years until Joel's death, the two exchanged hundreds of letters. In April, 1955, Joel asked Sinkler to edit and collaborate on the rewriting of a transcript of his recording entitled, "The Easter of Our Lives." Thereafter, they worked together on the writing, editing and publishing of numerous articles, pamphlets and books. In each instance the authorship was attributed to Joel. In 1957 Sinkler commenced preparing and editing the monthly Letter, using recordings of Joel's classes for source material. Authorship was attributed to Joel, who approved the contents of each Letter. After his death, Sinkler continued to prepare and edit the Letter, but authorship continued to be attributed to Joel.

On February 3, 1967, Joel's widow, Emma, and Sinkler entered into a written agreement for Sinkler's work on the monthly Letter. Pursuant to the agreement Sinkler was also to assemble the Letters into annual books. Authorship was to be attributed to Joel. Emma was to pay Sinkler for her services. Eight books were prepared, the last of which was published in 1970. Each of the books was copyrighted in Emma's name.

The agreement provided for cancellation by either party upon 30-days written notice. By a letter dated September 15, 1981, Emma cancelled the agreement, terminating Sinkler's involvement with the monthly Letter after the November, 1981, issue.

Since Joel's death, Sinkler has conducted classes on The Infinite Way, using Joel's copyrighted tapes and writings. From the time of Joel's death to about 1973, Emma attended some of these classes. Other persons also conduct classes on The Infinite Way. Until 1978, Sinkler sold Joel's tapes, which she obtained from the offices of The Infinite Way. In 1978, she began selling her own tapes of her lectures and The Infinite Way classes.

In 1973 a book written by Sinkler, *The Spiritual Journey of Joel S. Goldsmith,* was published. The book included some of Joel's letters to Sinkler. The book reportedly displeased Emma.

In 1981 Sinkler completed a second book, *Horizons of Consciousness,* a large part of which consisted of correspondence between her and Joel. Her publisher, Harper and Row, requested a signed release from Emma, who refused to sign. Consequently, Harper and Row cancelled plans to publish *Horizons.*

In 1977, Emma conveyed the business of The Infinite Way to McDonald. On July 26, 1983, a copyright was registered for a work shown as "Group of Letters Written by Joel S. Goldsmith to Lorraine Sinkler from 1949 to 1964." The registration was accomplished by Lloyd L. Zickert, who is shown as the authorized agent of Emma A. Goldsmith. The certificate of registration recites that Emma obtained ownership of the copyright by intestate succession. The record of this case includes a copy of the Last Will and Testament of Joel. There is nothing to indicate whether it was ever probated.

## SUMMARY JUDGMENT ISSUES RE THE COMPLAINT

Sinkler's complaint alleges four causes of action and seeks a declaratory judgment "declaring the rights, duties and legal relations of plaintiff and defendant with regard to the letters, memoranda and manuscripts of Joel S. Goldsmith and that plaintiff be granted the right to publish the book *Horizons of Consciousness* and any and all

letters of Joel S. Goldsmith that he sent to plaintiff."

*License by Joel*

■ In her first cause of action Sinkler alleges that Joel gave her "an express license to utilize any and all conversations, tape recordings, notes, letters, manuscripts and other memoranda in any way [Joel] saw fit," and that the permission took the form of both "oral and written communications." The written communications are alleged to consist of a note dated January 29, 1960, from Joel to Sinkler that stated, "In two envelopes are notes accumulated these past 10 years & you may wish to make a JSG notebook" and a letter dated January 27, 1963, in which Joel told Sinkler, "Some day you may publish this in a Letter or as a personal Letter to all who receive the Letters. You will know when the time is right. It may be while I am still with you in the flesh or it may be later." Neither of these materials can reasonably be construed as granting an express license to publish all of Joel's materials.

IT IS ORDERED granting summary judgment in favor of Emma and against Sinkler on the issue of whether Sinkler has a right to publish materials written by Joel because of an express license granted by him.

*License by Emma*

■ Sinkler's second cause of action alleges that Emma gave her a license to publish Joel's letters in writing and orally. She bases her claim of a written license on a handwritten note dated May 27, 1972, in which Emma gave Sinkler "permission to quote from Joel S. Goldsmith's tape recordings, books and other writings." Within the context of the letter, the word "quote" means "to speak or write (a passage) from another's work verbatim...." Webster's Third New International Dictionary (1976). Publishing passages from Joel's letters cannot be expanded to publishing the entire letters themselves.

The only evidence in the record that Emma granted Sinkler oral permission to publish Joel's private letters is Sinkler's testimony.

■ Emma contends that any license that she gave Sinkler to publish Joel's letters was terminated by Emma's refusal to sign the release required by Harper and Row before it would publish *Horizons of Consciousness.* Whether the refusal manifested her termination of any license is a question of fact. It is also a question of fact whether Emma was competent at the time that the 1981 refusal was purportedly given.

IT IS ORDERED denying Sinkler's motion for summary judgment on the issue of whether Emma gave Sinkler a written license to publish Joel's letters.

IT IS ORDERED denying summary judgment on the issue of whether Sinkler had an oral license from Emma to publish the letters.

*First Amendment*

■ The third cause of action alleges that Sinkler and other students of The Infinite Way are being deprived by Emma of rights guaranteed by the First Amendment to the Constitution of the United States. The amendment applies only to government (civil authority) by limiting its powers to interfere with religious worship and freedom of speech. *See School District of Abington Township, Pa. v. Schempp*, 374 U.S. 203, 222–23, 83 S.Ct. 1560, 1571–72, 10 L.Ed.2d 844 (1963).

IT IS ORDERED granting summary judgment in favor of Emma on Sinkler's third cause of action.

*Joint Work*

■ Sinkler's fourth cause of action alleges that *Horizons of Consciousness* is a joint work of Sinkler and Joel. The Copyright Act of 1976 defines a joint work as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. *Horizons of Consciousness* was started by Sinkler in 1978 and completed in 1981—many years after Joel's death. There is nothing in the record to suggest that before his death, Joel and Sinkler in-

tended that their letters to each other "be merged into inseparable or interdependent parts of a unitary whole."

IT IS ORDERED granting summary judgment in favor of Emma on Sinkler's fourth cause of action.

## SUMMARY JUDGMENT ISSUES RE THE COUNTERCLAIM

*Declaratory Judgment*

The first counterclaim seeks a declaratory judgment that Sinkler has no right to publish the letters written to her by Joel. Emma claims that she holds the copyright to Joel's letters. Sinkler denies that Emma has a copyright in Joel's letters because (1) he abandoned any such interest by the September 29, 1960, note and the January 27, 1963, letter to Sinkler, (2) he never owned a copyright interest in the letters, and (3) Emma was incompetent at the time of the 1983 registration of the copyright.

Nothing in the 1960 note or the 1963 letter suggests an intent on Joel's part to abandon whatever rights he may have had in his letters. The note does not refer to any letters at all. The letter contains only an authorization to publish that particular letter.

"[T]he general rule is that the author of a letter retains the ownership of the copyright or literary property contained therein while the recipient of the letter acquires ownership of the tangible physical property of the letter itself." Nimmer on Copyright, § 5.04 at 5–32 (1985). Sinkler, who is not a lawyer, was aware of this principle before this action was commenced. *See* Defendant's Exhibits 530C and 531C. Upon Joel's death, ownership of the copyright in his letters would have passed to Emma, his widow.

Copyright protection does not depend upon registration with the Copyright Office. 17 U.S.C. § 408(a). Therefore, the issue of whether Emma was mentally competent at the time that the copyright of Joel's letters was registered is not relevant.

However, Emma's copyright does not extend to all of Joel's letters. Some of them were published in *The Spiritual Journey of Joel S. Goldsmith* either with Emma's permission or acquiescence. Whatever copyright Emma had in those letters must be deemed to have been abandoned.

IT IS ORDERED granting summary judgment in favor of Emma on her first counterclaim declaring that she has a copyright in Joel S. Goldsmith's letters, except those that have previously been published by Sinkler in *The Spiritual Journey of Joel S. Goldsmith.*

*Copyright Infringement*

Emma's second counterclaim alleges that Sinkler has infringed her copyright of Joel's letters by "reading the copyrighted letters to large groups of students in their original form or in revised form . . . without permission or license from counterplaintiff." Sinkler contends that the use of the letters constituted a "fair use" authorized by 17 U.S.C. § 107. The doctrine generally applies to materials already released by an author for public consumption, either expressly or through de facto publication. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* —— U.S. ——, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). There is no evidence that Joel, either expressly or by performance or dissemination, released his letters for public consumption.

IT IS ORDERED granting summary judgment in favor of Emma and against Sinkler adjudging that Sinkler's publication of any of Joel's unpublished letters, except those published in *The Spiritual Journey of Joel S. Goldsmith,* does not constitute fair use.

*Breach of Contract*

Emma's third counterclaim seeks damages for breach of contract. It is undisputed that Emma and Sinkler entered into a contract dated February 3, 1967, that required Sinkler "to produce a monthly letter from [writings and tape recordings of Joel], and to assemble said letters into a

book at the end of each calendar year." Emma appears to have inserted between "calendar" and "year" the language, "sometime during the following." Her initials appear by the insertion. Sinkler's do not. The contract provided that Emma would pay Sinkler $400 per month. At some time undislosed by the record, the amount payable per month was changed to $500. The contract also provided that either party could cancel by giving the other a 30-day written notice.

From 1964 to and including the November, 1981, Letter, Sinkler prepared the monthly Letter of The Infinite Way as required by her contract. She also annually assembled the monthly Letters into books until 1971. She contends that she discontinued assembling the Letters into books at that time because the publisher informed her that there was no market for the books. By a letter dated September 15, 1981, Emma informed Sinkler that she was terminating the contract.

During the time the contract was in existence, Sinkler was paid varying amounts ranging from $100 to $600 per month.

Emma claims that she has been damaged by Sinkler's failure to assemble the annual books.

There are clearly issues of fact regarding the extent to which the parties may have amended or modified the original agreement and regarding the profits that Emma may have realized from the annual books.

IT IS ORDERED denying Emma's motion for summary judgment on the third counterclaim.

*Trademark Infringement*

The fourth counterclaim alleges trademark infringement in violation of 15 U.S.C. § 1125(a). Emma contends that "The Infinite Way" is a trade name and that she has the exclusive right to use it. If "The Infinite Way" is indeed a trademark or a trade name, it could well have attained a secondary meaning as the name of a religious movement. Whether the name has acquired a secondary meaning is

an issue of fact. *Am. Scientific Chem. v. Am. Hosp. Supply,* 690 F.2d 791, 792 (9th Cir.1982) (citing *Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.,* 448 F.2d 1293, 1296 (9th Cir.1971)). However, other undisputed facts establish that Sinkler is entitled to use the name as a matter of law.

Sinkler has been lecturing on "The Infinite Way" for over 20 years. Emma has been aware of these lectures. She attended some of them. The first time that she ever contended that Sinkler was engaging in unfair competition by using "The Infinite Way" was in connection with this action. Sinkler has affirmatively pleaded facts that are sufficient to allege defenses of laches and acquiescence. The defenses of acquiescence and laches apply as a matter of law.

IT IS ORDERED granting summary judgment in favor of Sinkler on the fourth counterclaim.

*Fifth Counterclaim*

Emma's fifth counterclaim alleges that she is "the sole owner of the right to benefit from the name of her husband and the preeminence of her husband gained during his lifetime" and that "Sinkler has been using and will continue to use the preeminence of Joel S. Goldsmith in the conduct of her classes and lectures."

The notable and famous have the "exclusive right during life to control and profit from the commercial use of their name and personality." *Memphis Development Foundation v. Factors Etc., Inc.,* 616 F.2d 956, 957 (6th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980). Generally, the right does not survive one's death. *Cf. Maritote v. Desilu Productions, Inc.,* 345 F.2d 418 (7th Cir.), *cert. denied,* 382 U.S. 883, 86 S.Ct. 176, 15 L.Ed.2d 124 (1965). However, the right of publicity has been held to survive if the holder of the right exploited it during his lifetime. *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 222–23 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). *But see Memphis Development,* 616 F.2d at 960 (assignment of

right of publicity during life is not sufficient to convert it to an inheritable property right after death).

There is no showing that Joel exploited the use of his name and personality by assigning the right to use them to another.

IT IS ORDERED granting summary judgment in favor of Sinkler on the fifth counterclaim.